UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

JAMES KELLY LAMBERT,                        CIVIL ACTION
INDIVIDUALLY AND ON BEHALF OF
OTHERS SIMILARLY SITUATED

VERSUS                                      NO: 05-5931

BOARD OF COMMISSIONERS OF THE               SECTION: R(4)
ORLEANS LEVEE DISTRICT, ET AL.


**ORDER AND REASONS**

Before the Court is plaintiffs' Motion to Certify a Class.

For the following reasons, the Motion is DENIED.


**I.    FACTUAL AND PROCEDURAL BACKGROUND**

**A.    Introduction**

Plaintiffs James Kelly Lambert, Donald Scott, and Robin

Lovelock brought this case as a purported class action on behalf

of similarly-situated persons who own vessels located in two

Orleans Parish marinas operated by the Board of Commissioners for

the Orleans Levee District.  Plaintiffs name as defendants the

Levee District; James P. Huey, the former President of the Levee District; Marine Recovery and Salvage, LLC ("Marine Recovery"); George Carmouche, a former attorney for the Levee District; Douglas Scott Carmouche; Michael George Mayer; Resolve Marine Group ("Resolve"); and St. Tammany Pearl River Salvage.[1]

Plaintiffs allege generally that Hurricane Katrina damaged and/or destroyed many vessels located in the two marinas, but that many other vessels suffered little or no damage from the storm itself.  After the storm, both the vessels that were damaged by the storm and the ones that did not suffer significant damage needed immediate attention to prevent further damage from sitting incorrectly in the water or sitting out of the water entirely.  Plaintiffs alleged that the Levee District imposed unnecessarily strict requirements on their ability to access their vessels in order to salvage them.  Plaintiffs allege that defendants imposed these limitations, at least initially, to prevent vessel owners from salvaging their vessels on their own or through a marine salvage contractor of their choosing and to force vessel owners to pay exorbitant prices to certain of the defendants in order to have their vessels salvaged.

Plaintiffs assert a number of claims against the various defendants, including breach of contract, violation of Louisiana

---

[1]St. Tammany Pearl River Salvage was terminated from the case on October 30, 2006. (R. Doc. 86).

antitrust law,[2] violation of the Louisiana Unfair Trade Practices
Act, intentional tort, a civil rights claim under 42 U.S.C. §
1983, breach of a compensated depositary contract, and negligence
on the part of a negotiorum gestor.

   **B.   Factual Background**

   The Levee District operates two marinas, the Orleans Marina
and the South Shore Harbor Marina, on the south shore of Lake
Pontchartrain.  A large number of vessels docked at both of these
marinas were damaged, tossed ashore, or sunk as a result of
Hurricane Katrina, which swept through southeast Louisiana on
August 29, 2005.  On or about September 12, 2005, the Levee
District allegedly gave Marine Recovery exclusive authority to
oversee all salvage operations in the two marinas.  Defendants
Douglas Scott Carmouche (the son of defendant George Carmouche, a
Levee Board attorney) and Michael Mayer allegedly formed Marine
Recovery on September 8, 2005.  Marine Recovery then allegedly
entered into exclusive contracts with Resolve and St. Tammany
Pearl River to carry out the salvage operations.  Plaintiffs
allege that defendants designed this arrangement to provide
Resolve and St. Tammany Pearl River with the exclusive right to
conduct salvage operations in the two marinas, thus permitting
them to charge inflated rates for their services.  These

_____

[2] Plaintiffs' latest memorandum suggests they made claims under
the Sherman Act as well as state antitrust statutes.  Plaintiffs
did not make these claims in any of their complaints, and thus
the Court will not consider them.

companies then allegedly passed some portion of the revenue from these overpriced salvage services on to certain other defendants and unidentified third parties.

Plaintiffs assert that throughout September and October 2005, Levee District personnel prevented vessel owners from accessing their vessels in order to move and/or salvage them. Levee District personnel told plaintiffs that only Marine Recovery and its designated agents were permitted to access the marinas in order to move vessels.  Plaintiffs also assert that they were told that anyone who attempted to enter the marinas without the Levee District's permission would be arrested by the Levee Board Police.

Plaintiffs allege that, during this period, Resolve and St. Tammany Pearl River salvaged and/or moved many vessels without permission from either the vessel owner or the vessel's insurer, that Resolve and St. Tammany Pearl River sent the owners of these vessels inflated bills for their services, and that these unauthorized salvage attempts often caused additional damage to the vessels.

On October 3, 2005, several insurance companies filed suit in civil district court in Baton Rouge, challenging both the exclusivity arrangement among the Levee District, Marine Recovery and Salvage, Resolve, and St. Tammany Pearl River and the excessive salvage fees being charged by Resolve and St. Tammany Pearl River.  The state court issued a temporary restraining

order on October 4, 2005.  The parties resolved the suit on or about October 13, 2005, when the Levee District agreed that it would no longer give Marine Recovery, Resolve, and St. Tammany Pearl River exclusive access to the marinas.  Plaintiffs allege, however, that the Levee District nevertheless continued to give these entities exclusive access to the marinas until at least October 25, 2005.

On or about October 26, 2005, the Levee District posted on its website a new policy that ostensibly allowed other salvage companies into the marinas in order to recover vessels.  Under this policy, the Levee District would permit any salvage company to enter the marina and access vessels after the company complied with the following conditions: (1) that it provide the Levee District with proof of insurance showing the Levee District as an additional insured on the policy; (2) that it provide a list of vessels that were to be moved, including the name of each vessel's owner; and (3) that it provide written authorization from the insurance company insuring each vessel that it intended to move.  Under the policy, once a company furnished this information, the Levee District would review the documentation and provide the contractor with written permission to enter the marinas.  The policy required authorized contractors to schedule all salvage operations with the Baton Rouge office of the Levee District.  A statement accompanying the revised marina access policy noted that the Levee District had already authorized two

companies, Resolve and St. Tammany Pearl River, to conduct salvage operations in the marinas.

Plaintiffs allege that Marine Recovery, Resolve and St. Tammany Pearl River continued to have *de facto* exclusive access to the marinas, despite the revised policy.  Plaintiffs allege that the Levee District did not require Resolve and St. Tammany Pearl River to comply with the new procedures, but it instead treated them as "favored" contractors because they had agreed to pay Marine Recovery a "commission" of 10 percent of their income from salvage operations in the marinas.  Plaintiffs further allege that the "Byzantine" procedures mandated by the Levee District's revised policy on marina access were overly strict and time-consuming, which hindered other contractors in complying with them and gaining access to salvage vessels in the marinas.

On or about December 23, 2005, the Levee District again revised its policy on marina access.  Under the current policy, a salvage contractor can operate in the marina if it provides proof of at least $1 million in liability insurance covering salvage operations, names the Levee District as an additional insured on the policy, and executes a hold harmless agreement in favor of the Levee District.  In addition, the contractor must obtain the permission of the owner and/or insurer of each vessel that it intends to salvage and inform the Levee District of the identities of the vessels to be salvaged.  Authorized contractors may then conduct salvage operations at the marina without the

need to schedule operations with the marina managers.

### C.   Procedural Background

Plaintiff Lambert originally brought this purported class action in Civil District Court for the Parish of Orleans. (R. Doc. 1 at 11).  Plaintiff filed a First Supplemental and Amending Class Action Complaint in state court and added Donald Scott as a named plaintiff. (R. Doc. 1 at 5).  Defendants removed the case to federal court on November 22, 2005.  On January 23, 2006, plaintiffs amended their class action complaint again, adding Robin Lovelock as a named plaintiff. (R. Doc. 18).

Plaintiffs first filed a Motion to Certify Class on February 21, 2006, and the Court denied the motion without prejudice until the Motions to Dismiss pending at the time were resolved. (R. Doc. 44).  The plaintiffs filed another Motion to Certify Class on June 25, 2007. (R. Doc. 109).  Judge Porteous heard oral argument on the Motion on November 16, 2007.


## II.  LEGAL STANDARD

Class actions are governed by Rule 23 of the Federal Rules of Civil Procedure.  The class certification determination rests within the sound discretion of the district court. *Unger v. Amedisys Inc.*, 401 F.3d 316, 320 (5th Cir. 2005).  The court, however, should not grant class certification unless it is satisfied, after "rigorous analysis," that all Rule 23

prerequisites have been met. *Id*. at 320 (citing *Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 161 (1982)).

To be certified, the class must first satisfy four threshold requirements.  A court may certify a class only if:

> (1)  the class is so numerous that joinder of all members is impracticable;
>
> (2)  there are questions of law or fact common to the class;
>
> (3)  the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4)  the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).  The party seeking certification bears the burden of establishing these requirements. *Unger*, 401 F.3d at 320 (citing *Berger v. Compaq Computer Corp.*, 257 F.3d 475, 479-80 (5th Cir. 2001)).  If the prerequisites of Rule 23(a) are met, the proposed class must additionally satisfy one of the three provisions for certification under Rule 23(b). *Cole v. General Motors Corp.*, 484 F.3d 717, 723 (5th Cir. 2007).  For certification of an injunctive class under 23(b)(2), plaintiffs must show that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2).  For certification of a 23(b)(3) class, the district

court must make a finding that questions of law or fact common to

class members predominate over questions affecting only

individual members and that a class action is the best way to

adjudicate the controversy. Fed. R. Civ. P. 23(b)(3); *Unger*, 401

F.3d at 320.


**III. DISCUSSION**

In their original petition in state court, plaintiffs

proposed a class defined as:

> Those individuals who are owners of vessels located in
> the marinas operated by [the Levee District] in Orleans
> Parish—the Orleans Marina and the South Shore Harbor
> Marina, whether insured or not—who were denied access
> to their vessels by [the Levee District] and whose
> designated representatives were also denied access to
> their vessels, in furtherance of the conspiracies
> alleged herein.

(R. Doc. 1 at 30).  In the original petition, plaintiffs did not

specify whether this was an injunctive class or a damage class,

but they sought both forms of relief.  In their motion for class

certification, plaintiffs propose a broad damage class consisting

of:

> All owners of vessels in the Orleans Marina and
> Southshore Marina as of the date of Hurricane Katrina,
> who were denied the right to access, salvage, and
> repair their vessels or had the use of such rights
> delayed or made more difficult or expensive, had their
> vessels damaged or moved by defendants or under the
> authority of defendants without their permission after
> Katrina, were forced to pay substantially higher than
> market prices set by Marine Recovery and Salvage and
> Resolve Marine Group pursuant to the authority granted
> by the Orleans Levee District as a result of a
> conspiracy between [Marine Recovery], its principals,

> [the Levee District], and its principles, and, *inter alia*, Resolve, and/or were denied, under color of law, constitutional, property, and/or contractual rights concerning their vessels and access to their vessels by salvors.

(R. Doc. 109).  In the motion plaintiffs also propose an injunctive class consisting of:

> All present tenants of Orleans Marina and Southshore Marina who are seeking to obtain permanent injunctive relief against a repetition, in the event of another hurricane or similar destructive catastrophe, from those actions taken by defendants and their successors after Katrina that are contended to be violations of the lease agreements, unlawful, and/or anticompetitive.

(R. Doc. 109).

In deciding the certification order, the Court will not hold plaintiffs to the narrow class definition in their complaint. *See In re Monumental Life Ins. Co.*, 365 F.3d 408, 414 (5th Cir. 2004) (finding that the court must look to the certification motion for an adequate description of the proposed class).  Holding plaintiffs to the class definition in the complaint would ignore the "ongoing refinement and give-and-take inherent . . . in the formation of a workable class definition." *Id.*

## A.   Numerosity

Rule 23(a)(1) requires that the class be so large that joinder of all members is impracticable.  To satisfy the numerosity requirement, "a plaintiff must ordinarily demonstrate some evidence or reasonable estimate of the number of purported class members." *Pederson v. Louisiana State University*, 213 F.3d

858, 868 (5th Cir. 2000) (quoting *Zeidman v. J. Ray McDermott & Co., Inc.,* 651 F.2d 1030, 1038 (5th Cir. 1981)).  A mere allegation that the class is too numerous to make joinder practicable is insufficient. *Pederson*, 213 F.3d at 868 (citing *Fleming v. Travenol Laboratories, Inc.*, 707 F.2d 829, 833 (5th Cir. 1983)).

Plaintiffs claim that numerosity exists because there were 737 tenants at the Orleans and South Shore Marinas on the date of Katrina.  Plaintiffs essentially contend that all of the tenants in the marinas were denied access to their vessels or were delayed in accessing their vessels because of defendants' actions.  Plaintiffs, however, have not provided any proof that the other tenants were denied or delayed in exercising their right to access, salvage, and repair their vessels, or were affected by defendants' alleged price-fixing scheme.  As defendants point out, not all of the vessels required salvage. Many owners moved their vessels before Katrina. *(See* R. Doc. 122-2, Exhibit G, Exhibit H).  Other vessels simply did not require salvage. (*See* R. Doc. 122-2, Exhibit I, Exhibit J). Additionally, as for the owners whose vessels were salvaged, those who had comprehensive insurance coverage did not pay the defendants, and thus were not affected by any allegedly high prices.  As such, plaintiffs cannot presume that all 737 tenants fit the class definition.  Without more evidence, the number of

tenants alone is insufficient to satisfy the numerosity requirement.

The plaintiffs themselves have admitted that the number of potential class members is much lower than 737.  If the class is limited to the uninsured vessels[3] at the marinas, then the number is less than 80. (*See* R. Doc. 148 at 6).  If the class is limited to the number of tenants whose boats were actually salvaged, then the number is even smaller.  In their Reply Memorandum (R. Doc. 148), plaintiffs suggest that Marine Recovery was involved with at least 32 vessels, since 32 boats were spray painted in the South Shore Marina with "MRS" and an identification number.  Of those, it is unclear how many of the vessels were uninsured. Plaintiffs also state that at least 24 non-insured vessel owners dealt directly with Resolve.  Since Resolve subcontracted with Marine Recovery to salvage the boats, and Marine Recovery did not salvage any boats itself, the boats of the 24 vessel owners, if they were salvaged, were likely among the 32 boats spray-painted with "MRS."

Further, after over two years of discovery, plaintiffs can identify only one other tenant at the marinas who partially fits the class definition.[4] (*See* R. Doc. 154-1).  Plaintiffs have

_____

[3] The vessel owners who carried insurance and whose insurers voluntarily paid the prices they freely negotiated with Resolve and the other salvors would have incurred no damages from the alleged conspiracy.

[4] In his affidavit, Augustus Bazin states that he had to scale a wall to access his vessel in the Orleans Marina.  As such, he may have been "denied" access to his vessel.  Still, Bazin does not

continually failed to identify any other tenants who may have been harmed by defendants' actions. For instance, when asked in various interrogatories to identify other putative class members, Lambert could not produce any names and simply answered that the information was not in his possession at the time. (R. Doc. 122-2, Exhibit K). Similarly, when Scott was asked to identify other putative class members, he answered that he "knows of no persons other than Lambert and Lovelock." (R. Doc. 122-2, Exhibit K). In his deposition, Scott also testified that he had "no idea" who the members of the class were. (R. Doc. 125-3 at 80). Lovelock testified that he had not talked to any other lessees with complaints similar to his. (R. Doc. 125-2 at 72).

The Court finds that plaintiffs have not met their burden of proving numerosity. Plaintiffs have produced only one tenant who claims he was denied access to his boat by defendants. Plaintiffs have not produced any evidence of others who were harmed by the defendants alleged price-fixing scheme. Defendants, however, have produced four affidavits of tenants who were not denied access or delayed in accessing their boats after the hurricane. Further, plaintiffs themselves acknowledge that Resolve dealt with only 24 uninsured vessels. Even if all 24 vessel owners were denied access to their boats and charged above-market prices, the number of putative class members is

---

state that his vessel needed to be salvaged or that he had any dealings with Marine Recovery or Resolve.

13

insufficient to establish numerosity. *See Boykin v. Georgia Pacific Corp.*, 706 F.2d 1384, 1386 (5th Cir. 1983) (finding that a proposed class of 20 members would not satisfy the numerosity requirement, but a class of 317 would); *Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 624 (5th Cir. 1999) ("any class consisting of more than forty members 'should raise a presumption that joinder is impracticable'") (citing 1 Newberg on Class Actions § 3.05, at 3-25 (3d ed. 1992)).  Even assuming that all 32 vessel owners whose boats were salvaged fit within the class definition, the Court still finds that the number of potential class members is not so high that joinder is impracticable.  As such, the numerosity requirement is not satisfied.

**B.    Commonality**

The commonality test of Rule 23(a)(2) is met when there is at least one issue whose resolution will affect all or a significant number of the putative class. *Mullen*, 186 F.3d at 625 (quoting *Lightbourn v. County of El Paso*, 118 F.3d 421, 426 (5th Cir. 1997)).  Because of this minimal requirement, "[t]he threshold of commonality is not high." *Jenkins v. Raymark Inds., Inc.*, 782 F.2d 468, 472 (5th Cir. 1986).

The Court finds that plaintiffs have met this requirement. Plaintiffs assert the existence of a conspiracy that allegedly violated Louisiana antitrust laws and LUTPA.  Thus a number of issues could affect all plaintiffs:  whether or not the

14

conspiracy existed, whether or not the conspiracy violated the antitrust laws, and whether or not the conspiracy violated LUTPA. Accordingly, the Court finds the commonality requirement satisfied.

### C.   Typicality

Rule 23(a)(3) requires that "claims or defenses of the representative parties [be] typical of the claims or defenses of the class."  The test for typicality is not demanding, *Shipes v. Trinity Inds*., 987 F.2d 311, 316 (5th Cir. 1993)), and it focuses on the general similarity of the legal and remedial theories behind their claims. *Lightbourn*, 118 F.3d at 426; *Jenkins*, 782 F.2d at 472.  A typicality inquiry may be used to "screen out class actions in which the legal or factual position of the representatives is markedly different from that of other members of the class even though common issues of law and fact are present." 7A Wright & Miller, *Federal Practice and Procedure* § 1764 (2008).

The Court finds that plaintiffs have not met the typicality requirement.  Antitrust claims usually satisfy the typicality requirement. *See, e.g., Bell Atlantic Corp. v. AT&T Corp.*, 339 F.3d 294, 302 (5th Cir. 2003); *Piggly Wiggly Clarksville, Inc. v. Interstate Brands Corp.*, 215 F.R.D. 523, 530 (E.D. Tex. 2003); *In re Lease Oil Antitrust Litigation (No. II)*, 186 F.R.D. 403, 421 (S.D. Tex. 1999).  Still, "[t]here are no 'hard and fast rules .

15

. . regarding the suitability of a particular type of antitrust case for class action treatment.'" *Bell Atlantic*, 339 F.3d at 301 (quoting *Alabama v. Blue Bird Body Co.*, 573 F.2d 309, 316 (5th Cir. 1978)).  Instead, the facts and circumstances of each case determine whether the class should be certified. *Id.*  The Court finds that here, given the markedly different factual circumstances of the named plaintiffs and the fact that not all named plaintiffs have an antitrust claim, the typicality requirement has not been met.

The three named plaintiffs' claims involve quite varied factual circumstances.  Plaintiff Lambert, for instance, is the only one who was allegedly denied access to his vessel by the Levee District.[5]  After Katrina, Lambert's vessel was resting outside of the water at the marina.  Lambert needed to move the vessel back into the water so that the walls would not crack from the stress caused by the angle at which the vessel was resting. Lambert attempted to use some crane operators to move his vessel, but the Levee District refused to approve this, since the Levee District required salvors to satisfy three insurance requirements.  The marina manager, Beth Augustine, allegedly told Lambert that his vessel would have to be moved by Marine Recovery.  Since Marine Recovery contracted with Resolve to

---

[5]Defendants dispute that Lambert was denied access to his vessel, since Lambert testified in his deposition that he went to the marina quite often after the storm.  He stated that although the main gates were closed, he was able to get into the marina by climbing over a walk-through gate. (R. Doc. 140-4 at 27).

provide salvaging services, Lambert claims he had no choice but to contact with Resolve and agree to its high prices so that he could save his vessel. (*See* R. Doc. 122-1, Exhibit D).  After lifting the vessel, Resolve charged Lambert an additional $4,000. Defendants allege that the added costs were because Lambert's weight estimate was inaccurate.  Lambert has refused to pay the additional costs.

    As for Scott, his vessel was sunk after the Hurricane.  He does not claim that he was denied access to the marina by the Levee District.[6]  Scott initially hoped to raise the vessel himself with the help of his sons, two of whom were qualified scuba divers. (R. Doc. 122-1 at 30).  Augustine informed him that he could not raise the vessel himself.  Scott then talked to Resolve, and one of its agents told him that the price to raise the boat would be $5,600.  After negotiations with the agent, Scott was able to obtain an oral promise from Resolve to raise his vessel for $1,500.  When Scott spoke to Resolve next, he claims it reneged on the promise and reverted back to its original $5,600 quote.  Scott refused to sign the contract, and Resolve never performed work on Scott's behalf.

    Lovelock's vessel also sank because of the Hurricane. Before returning after the storm, Lovelock contacted various contractors to move his vessel.  Lovelock testified that one

_____

[6]Scott testified that he could not enter the marina during the month of September, 2005, because the National Guard would not let him enter the city. (R. Doc. 122-1 at 28-29).

contractor, Horizon, was approved by the Levee District and was going to remove his vessel, but refused to move it after it determined that the vessel was too close to the water. (R. Doc. 122-2 at 37).  Lovelock also contacted Resolve, but he claims that they never quoted him a price. (R. Doc. 122-2 at 44).  When he returned to New Orleans, Lovelock discovered that Resolve had raised his vessel, without his authorization, and had placed it into a parking lot.  The vessel was looted while in the parking lot.  Lovelock was able to access the vessel, and he removed some personal items from it. (R. Doc. 122-2 at 101).  Although Resolve raised Lovelock's vessel by mistake, Lovelock claims it demanded payment for salvaging and storing the vessel.  Still, Lovelock testified that Resolve never sent him a bill for the salvage. (R. Doc. 122-2 at 46).  Lovelock had insurance on his vessel and received $35,000 from his insurance company. (R. Doc. 122-2 at 34).  After he paid off the mortgage on his vessel, he was left with about $10,000.

The facts surrounding the three named plaintiffs' claims differ markedly.  Only one plaintiff, Lambert, paid the allegedly high fees resulting from the conspiracy.  Scott never entered into a salvage contract because of the fees, and Lovelock's boat was salvaged without charge.  Thus Lovelock was not even harmed by the alleged price-fixing of the defendants.[7]  Further, some of

---

[7]Additionally, Lovelock's testimony that Horizon was ready to salvage his boat is contrary to plaintiffs' claim of a conspiracy to keep out all salvors but Resolve and St. Tammany Pearl River.

the plaintiffs were not denied access to their boats by the
defendants.  Scott testified that the National Guard, not the
defendants, prevented him from accessing the marina.  Lovelock
testified that he was able to access his vessel and take his
personal belongings.  Only Lambert claims he was denied access to
his vessel, but even he was able to visit his vessel often by
climbing over a walk-through gate.

Plaintiffs appear to have different claims entirely.
Lambert's claims arise from the denial of access to his vessel
and the allegedly high price he paid for its salvage.  Scott's
claims arise from the Levee District's denial of the right to
salvage the vessel himself and Resolve's refusal to abide by its
promise to salvage his vessel for $1,500.  Lovelock's claims stem
from Resolve's actions in mistakenly salvaging his vessel without
his knowledge.  As the claims of the parties themselves are quite
dissimilar, the Court does not see how the claims could be
typical of the proposed class.

Further, the very class definition shows that the class
members' claims are not typical.  Plaintiffs purport to establish
a class of defendants who were denied the right to access their
vessels *or* had the right to access their vessels delayed or made
more difficult.  Plaintiffs purport that the class should include
those who had their vessels damaged *or* moved by defendants *or*
under the authority of defendants without their permission.
Plaintiffs also define the class to include those who were forced

to pay substantially higher than market prices *and/or* were
denied, under color of law, constitutional, property, and/or
contractual rights.  Such an all-inclusive class definition shows
that the members of the proposed class had widely varying factual
and legal positions.  While such a broad definition could be
useful in achieving numerosity, it effectively defeats
typicality.  Accordingly, the Court finds that plaintiffs have
not met the typicality requirement.

**D.   Adequacy**

Rule 23(a) also requires that the representative parties
must "fairly and adequately protect the interests of the class."
This requirement is "essential to due process, because a final
judgment in a class action is binding on all class members. *In re
Am. Med. Sys., Inc.*, 75 F.3d 1069, 1083 (6th Cir. 1996) (citing
*Hansberry v. Lee*, 311 U.S. 32, 42-43 (1940)).  To meet the
adequacy requirement, the "class representatives, their counsel,
and the relationship between the two [must be] adequate to
protect the interests of absent class members." *Unger v. Amedisys
Inc.*, 401 F.3d 316, 321 (5th Cir. 2005) (citing *Stirman v. Exxon
Corp.*, 280 F.3d 554, 562 (5th Cir. 2002)).  The Court must be
satisfied that class representatives, and not their counsel, are
directing the litigation. *Unger*, 401 F.3d at 316.  Thus they
"must show themselves sufficiently informed about the litigation
to manage the litigation effort." *Id.*

20

In their initial briefs, defendants' main attack on
numerosity was plaintiffs' failure to prosecute the case.  At
that point in the case, plaintiffs had not taken any depositions
and had completed little other discovery.  Since then, plaintiffs
have undertaken some discovery and taken the depositions of many
defendants.  Since the Court has no current briefs on the issue
and the other matters are dispositive, the Court will not
consider this requirement.

**E.   Predominance**

For class actions seeking money damages, Rule 23(b)(3)
imposes two prerequisites, predominance and superiority:
"[Q]uestions of law or fact common to the members of the class
[must] predominate over any questions affecting only individual
members, and . . . a class action [must be] superior to the other
available methods for the fair and efficient adjudication of the
controversy." Fed. R. Civ. P. 23(b)(3).  To predominate, "common
issues must constitute a significant part of the individual
cases." *Mullen*, 186 F.3d at 626.  "This requirement, although
reminiscent of the commonality requirement of Rule 23(a), is 'far
more demanding' because it 'tests whether proposed classes are
sufficiently cohesive to warrant adjudication by
representation.'" *Unger*, 401 F.3d at 320 (quoting *Amchem Prods.,
Inc. v. Windsor*, 521 U.S. 591, 623-24 (1997)).

21

Plaintiffs have failed to demonstrate that common issues of the class predominate over individual issues.  Again, plaintiffs' class definition illustrates that plaintiffs are not similarly situated.  Not all of the plaintiffs have the same claims.  For instance, the class definition includes some plaintiffs who were denied the right to access, salvage, and repair their vessels (such as Scott, who was denied the right to salvage his vessel himself), as well as those who had the use of such rights delayed or made more difficult or more expensive (such as Lambert, who, after a delay, had his vessel salvaged at an allegedly high price).  The class also includes those, like Lovelock, but unlike the other two named plaintiffs, who had their vessels damaged or moved by defendants without their permission.  Thus the class definition itself shows the individualized nature of the claims and the lack of common issues that predominate.

Further, plaintiffs have not sought to limit the class definition to certain claims.  Even if some of plaintiffs' claims were suitable for determination as a class, plaintiffs have included a hodgepodge of other claims not amenable to class determination in their class definition.  For instance, plaintiffs have alleged civil rights claims, breach of contract claims, breach of a compensated depositary contract claims, and claims of negligence on the part of a negotiorum gestor.  Even if plaintiffs' antitrust claims were amenable to class certification, these claims would hardly predominate over the

mishmash of other claims plaintiffs have alleged.  Additionally,
plaintiffs have not suggested a single damages model for the
case.  With such widely variant claims and facts, the Court would
necessarily have to look at the circumstances of each person to
make determinations of causation and damages.  Ultimately, the
Court would have to determine what happened to each person's
boat.  The Court would have to undertake an individual inquiry
into the damage incurred and who caused it by what conduct.  This
necessary task shows that plaintiffs have not provided a cohesive
basis for a class action.  As such, the Court finds that
plaintiffs have not satisfied the predominance requirement.

**F.   Injunctive class**

For class-wide injunctive relief under Rule 23(b)(2),
plaintiffs must show that the party opposing the class acted "on
grounds that apply generally to the class." Fed. R. Civ. P.
23(b)(2).  "Class members must have been harmed in essentially
the same way, and injunctive relief must predominate over
monetary damage claims." *Maldonado v. Ochsner Clinic Found.*, 493
F.3d 521, 524 (5th Cir. 2007) (citing *Bolin v. Sears, Roebuck &
Co.*, 231 F.3d 970, 975 (5th Cir. 2000)).  Additionally, the
injunctive relief sought must be specific. *Maldonado*, 493 F.3d at
524 (citing Fed. R. Civ. P. 65(d)).  The requirement that
defendants' actions apply generally toward the class is more

permissive than Rule 23(b)(3)'s predominance requirement. *McManus v. Fleetwood Enters., Inc.*, 320 F.3d 545, 552 (5th Cir. 2003).

The Court finds that plaintiffs have not shown that defendants acted on grounds generally applicable to the class. Plaintiffs' claims for injunctive relief are just as much of a mishmash as plaintiffs' damages claims.  Plaintiffs seek injunctive relief against the repetition of defendants' actions in the event of another natural disaster.  But as discussed *supra*, defendants acted differently towards each plaintiff.  With regard to Lambert, Resolve allegedly charged Lambert a higher price and the Levee District allegedly denied him access to his boat by keeping the marina gates closed.  As for Scott, the Levee District allegedly refused to let him raise his sunken vessel by himself, and Resolve allegedly broke its oral promise to raise his vessel for only $1,500.  Plaintiff Lovelock's boat was mistakenly raised by Resolve, and he was never charged for the salvage.  Accordingly, plaintiffs have not shown that defendants acted on grounds generally applicable to the class.

Further, plaintiffs' claims for monetary relief predominate over plaintiffs' injunctive claims.  In (b)(2) class actions, monetary relief predominates "unless it is incidental to requested injunctive or declaratory relief." *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 415 (5th Cir. 1998).  Incidental damages "flow directly from liability to the class *as a whole* on the claims forming the basis of the injunctive or declaratory

24

relief." *Id.*  Here, instead, plaintiffs' injunctive claims are merely incidental to their damages claims.  Plaintiffs primarily focus on the damage caused by defendants' previous actions and merely tack on claims for injunctive relief in an alternative effort to get class certification.  The plaintiffs' alleged damages would not be merely incidental, since they would be dependent on defendants' actions with respect to each respective plaintiff, rather than from liability to the class as a whole. *See id.* (finding that incidental damages should not be "dependent in any significant way on the intangible, subjective differences of each class member's circumstances").  As such, the Court finds that plaintiffs have not met the requirements of 23(b)(2) with respect to their proposed injunctive class.

## IV.  CONCLUSION

For the foregoing reasons, the Court DENIES the plaintiffs' Motion to Certify Class.

New Orleans, Louisiana, this 10th day of September, 2008.

_____
SARAH S. VANCE
UNITED STATES DISTRICT JUDGE