UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

JAMES KELLY LAMBERT,                      CIVIL ACTION
INDIVIDUALLY AND ON BEHALF OF
OTHERS SIMILARLY SITUATED

VERSUS                                    NO: 05-5931

BOARD OF COMMISSIONERS OF THE             SECTION: R(4)
ORLEANS LEVEE DISTRICT, ET AL.


**ORDER AND REASONS**

A number of summary judgment motions are before the Court.
Defendants Marine Recovery and Salvage, LLC, Scott Carmouche, and
Michael Mayer have filed four motions for partial summary
judgment on plaintiffs' claims. (R. Docs. 207, 211, 214, & 217).
Defendant Resolve Marine Group has separately moved for summary
judgment on all of plaintiffs' claims. (R. Doc. 195).  The Court
rules as follows.


**I.    Background**

Plaintiffs James Kelly Lambert, Donald Scott, and Robin
Lovelock brought this case as a purported class action on behalf
of similarly-situated persons who own vessels located in two
Orleans Parish marinas operated by the Board of Commissioners for
the Orleans Levee District.  Plaintiffs name as defendants the
Board of Commissioners for the Levee District; James P. Huey, the

former President of the Levee District; Marine Recovery and Salvage, LLC ("Marine Recovery"); George Carmouche, a former attorney for the Levee District; Scott Carmouche; Michael Mayer; Resolve Marine Group ("Resolve"); and St. Tammany Pearl River Salvage.[1]

Plaintiffs allege generally that Hurricane Katrina damaged and/or destroyed many vessels located in the two marinas, but that many other vessels suffered little or no damage from the storm itself. After the storm, both the vessels that were damaged by the storm and the ones that did not suffer significant damage needed immediate attention to prevent further damage from sitting incorrectly in the water or sitting out of the water entirely. Plaintiffs allege that the Levee District imposed unnecessarily strict requirements on their ability to access their vessels in order to salvage them. Plaintiffs allege that defendants imposed these limitations, at least initially, to prevent vessel owners from salvaging their vessels on their own or through a marine salvage contractor of their choosing and to force vessel owners to pay exorbitant prices to certain of the defendants in order to have their vessels salvaged.

---

[1]St. Tammany Pearl River Salvage was terminated from the case on October 30, 2006. (R. Doc. 86).

Plaintiffs assert a number of claims against the various
defendants, including breach of contract, violation of Louisiana
antitrust law, violation of the Louisiana Unfair Trade Practices
Act, a civil rights claim under 42 U.S.C. § 1983, breach of a
compensated depository contract, and negligence on the part of a
negotiorum gestor.

**B.    Factual Background**

The Levee District operates two marinas, the Orleans Marina
and the South Shore Harbor Marina, on the south shore of Lake
Pontchartrain.  A large number of vessels docked at both of these
marinas were damaged, tossed ashore, or sunk as a result of
Hurricane Katrina, which swept through southeast Louisiana on
August 29, 2005.  On or about September 12, 2005, the Levee
District allegedly gave Marine Recovery exclusive authority to
oversee all salvage operations in the two marinas.  Defendants
Scott Carmouche (the son of defendant George Carmouche, a Levee
Board attorney) and Michael Mayer allegedly formed Marine
Recovery on September 8, 2005.  Marine Recovery then entered into
an allegedly exclusive contract with Resolve on September 29,
2005, to carry out the salvage operations.  Plaintiffs allege
that defendants designed this arrangement to provide Resolve with
the exclusive right to conduct salvage operations in the two
marinas, thus permitting it to charge inflated rates for its
services.  Resolve then paid Marine Recovery a percentage of the

revenue from these overpriced salvage services and allegedly passed on kickbacks to certain other defendants and unidentified third parties.

Plaintiffs assert that throughout September and October 2005, Levee District personnel prevented vessel owners from accessing their vessels in order to move and/or salvage them. Levee District personnel allegedly told plaintiffs that only Marine Recovery and its designated agents were permitted to access the marinas in order to move vessels. Plaintiffs also assert that they were told that anyone who attempted to enter the marinas without the Levee District's permission would be arrested by the Levee Board Police.

Plaintiffs allege that, during this period, Resolve salvaged and/or moved many vessels without permission from either the vessel owner or the vessel's insurer, that Resolve sent the owners of these vessels inflated bills for their services, and that these unauthorized salvage attempts often caused additional damage to the vessels.

On October 3, 2005, several insurance companies filed suit in civil district court in Baton Rouge, challenging both the exclusivity arrangement among the Levee District, Marine Recovery and Salvage, and Resolve, and the excessive salvage fees being charged by Resolve and St. Tammany Pearl River. The state court issued a temporary restraining order on October 4, 2005. The

parties resolved the suit on or about October 13, 2005, when the Levee District agreed that it would no longer give Marine Recovery and Resolve exclusive access to the marina. Plaintiffs allege, however, that the Levee District nevertheless continued to give these entities exclusive access to the marinas until at least October 25, 2005.

On or about October 26, 2005, the Levee District posted on its website a new policy that allowed other salvage companies into the marinas in order to recover vessels. Under this policy, the Levee District would permit any salvage company to enter the marina and access vessels after the company complied with the following conditions: (1) that it provide the Levee District with proof of insurance showing the Levee District as an additional insured on the policy; (2) that it provide a list of vessels that were to be moved, including the name of each vessel's owner; and (3) that it provide written authorization from the insurance company insuring each vessel that it intended to move. Under the policy, once a company furnished this information, the Levee District would review the documentation and provide the contractor with written permission to enter the marinas. The policy required authorized contractors to schedule all salvage operations with the Baton Rouge office of the Levee District. A statement accompanying the revised marina access policy noted that the Levee District had already authorized two companies,

Resolve and St. Tammany Pearl River, to conduct salvage operations in the marinas.

Plaintiffs allege that Marine Recovery, Resolve and St. Tammany Pearl River continued to have *de facto* exclusive access to the marinas, despite the revised policy. Plaintiffs allege that the Levee District did not require Resolve and St. Tammany Pearl River to comply with the new procedures, but it instead treated them as "favored" contractors because they had agreed to pay Marine Recovery a "commission" of 10 percent of their income from salvage operations in the marinas. Plaintiffs further allege that the "Byzantine" procedures mandated by the Levee District's revised policy on marina access were overly strict and time-consuming, which hindered other contractors in complying with them and gaining access to salvage vessels in the marinas.

On or about December 23, 2005, the Levee District again revised its policy on marina access. Under the current policy, a salvage contractor can operate in the marina if it provides proof of at least $1 million in liability insurance covering salvage operations, names the Levee District as an additional insured on the policy, and executes a hold harmless agreement in favor of the Levee District. In addition, the contractor must obtain the permission of the owner and/or insurer of each vessel that it intends to salvage and inform the Levee District of the identities of the vessels to be salvaged. Authorized contractors

may then conduct salvage operations at the marina without the
need to schedule operations with the marina managers.

**C.   Plaintiffs' injuries**

**1. J. Kelly Lambert**

On September 27, 2005, Lambert first tried to enter Orleans
Marina to retrieve some personal items from his houseboat, the
M/V PHOENIX.  He walked through the floodgate, but claims he was
told by Beth Augustin, the assistant marina manager for the
Orleans marina, that he could not enter through the floodgate,
but had to use the walk gate in the future.  Augustin also
allegedly told him that Huey had to approve any salvor and that
Marine Recovery was the only salvor currently approved.  Lambert
talked to a third-party salvor, FEMA contracor G.W. Gordy, who
told him that his boat could be salvaged for $3,000. (Lambert
Depo., p. 93, 66:16-67:9).  Lambert testified that his chosen
salvor could not salvage his boat since he was not pre-approved
by the Levee Board.  Lambert eventually contracted with Resolve,
on October 22, 2005, to salvage the PHOENIX for the price of
$6,795. (R. Doc. 195-11, Exhibit AA).  Lambert asserts that he
sustained actual damages from the delay in salvaging his boat in
the amount of $42,795.00. (R. Doc. 226-9).

**2. Donald Scott**

Donald Scott was the co-owner of a vessel, the ALOHA, that
was moored in Orleans Marina when Hurricane Katrina hit. (Scott

Depo., p. 30, 17:23-18:20). Scott was able to access his vessel
on September 4, 2005, by using a ladder to climb over the wall
around the marina. (Scott Depo., p. 31, 23:25-25:7). Scott
claims he was not able to access the marina again until November
16, 2005. (Scott Depo., p. 32, 29:6-10). On that day, he spoke
with Augustin about salvaging his boat. (Scott Depo., p. 32,
29:21-30:2). Scott proposed that he and his sons, who were
certified scuba divers, could lift the boat, since it was only
half-sunk. (Scott Depo., p. 32, 30:8-12). Augustin told him that
the Levee District required salvors to carry $1 million in
insurance and that the only companies allowed to salvage boats
were Resolve and St. Tammany Pearl River. (Scott Depo., p. 32,
30:13-18, p. 34, 39:7-19). Scott could not get in touch with St.
Tammany, so he contacted Resolve about salvaging his boat.
Either Tim Erickson or Tim McGinnis initially quoted Scott a
price between $5,600 and $6,000. (Scott Depo., p. 35, 41:2-7).
After Scott complained that the price was too high since his boat
was only partially sunk, Tim informed Scott that the price would
be $1,500 if his insurance company found the boat to be a
navigational hazard. Resolve talked to Scott's insurance
company, and they refused to cover the salvage. (Scott Depo., p.
35, 44:6-22). The price then went back up to $5,600 to $6,000.
Scott decided that he could not afford to salvage his boat at
this price. On June 6, 2006, he ran an ad in a newspaper to sell

his boat for $1.00. The purchaser encountered no problems when he salvaged the boat the next weekend with his two sons and two divers. (Scott Depo. p. 38, 55:21-56:19). Scott claims that he sustained damage in the amount of $25,000 since his vessel was worth $25,000 before the hurricane. (R. Doc. 226-9).

### 3. Robin Lovelock

Lovelock's sailboat, the HEATHEN, was docked at South Shore Harbor when Hurricane Katrina hit. Lovelock did not contact anyone about his boat, other than friends with boats in the marinas, until he returned to New Orleans near the end of October. (Lovelock Depo., p. 3, 19:21-20:7). When he returned, he found that his boat had been salvaged from the water and placed on the bulkhead of the parking lot in the marina. (Lovelock Depo., p. 3, 19:4-17). Resolve had mistakenly salvaged his boat (Lovelock Depo., p. 9, 45:11-14, 47:4-9) and never charged Lovelock for the salvage. (Lovelock Depo., p. 9, 46:1-4). Lovelock claims that because of the salvage job, he lost the autopilot, a stainless steel wheel, and an anchor, for a total property loss of $2,400.00. (Lovelock Depo., p. 10, 51:20-54:9). A surveying company provided by Lovelock's insurance company estimated that the wreckage of his boat was worth a total of $1,000. (Lovelock Depo., p. 6, 33:6-14). Lovelock's insurance company then paid him $35,000 under the hull policy, and after

paying off $25,000 for the mortgage on the vessel, he was left
with $10,000. (Lovelock Depo., p. 6, 34:7-17).

### D.    Procedural Background

Plaintiff Lambert originally brought the case as a purported
class action in Civil District Court for the Parish of Orleans.
(R. Doc. 1 at 11).  Plaintiff filed a First Supplemental and
Amending Class Action Complaint in state court and added Donald
Scott as a named plaintiff. (R. Doc. 1 at 5).  Defendants removed
the case to federal court on November 22, 2005.  On January 23,
2006, plaintiffs amended their class action complaint again,
adding Robin Lovelock as a named plaintiff. (R. Doc. 18).

Plaintiffs first moved for class certification on February
21, 2006, and the Court denied the motion without prejudice until
the motions to dismiss pending at the time were resolved. (R.
Doc. 44).  After the Court denied defendants' motions to dismiss,
(R. Doc. 61), plaintiffs again moved for class certification on
June 25, 2007. (R. Doc. 109).  Judge Porteous heard oral argument
on the motion on November 16, 2007.  The case was transferred to
Section R, and this Court denied the motion to certify on
September 10, 2008. (R. Doc. 191).

The case is scheduled for bench trial on February 9, 2009.
(R. Doc. 186).  Before the Court are a number of motions for
summary judgment.  Defendant Resolve moves for summary judgment
on all of plaintiffs' claims. (R. Docs. 195).  Marine Recovery,

Scott Carmouche, and Michael Mayer have filed four separate
motions for partial summary judgment on the following claims: (1)
plaintiffs' claims under the Louisiana Unfair Trade Practices Act
(LUTPA), (2) plaintiffs' claims under 42 U.S.C. § 1983 and
allegations of price gouging, (3) plaintiffs' claims under the
Louisiana antitrust laws, and (4) plaintiff Lovelock's breach of
deposit and negligence claim. (R. Docs. 207, 211, 214, 217).


**II.  Legal Standard**

Summary judgment is appropriate when there are no genuine
issues as to any material facts, and the moving party is entitled
to judgment as a matter of law. *See* FED. R. CIV. P. 56(c); *Celotex
Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986).  A court must be
satisfied that no reasonable trier of fact could find for the
nonmoving party or, in other words, "that the evidence favoring
the nonmoving party is insufficient to enable a reasonable jury
to return a verdict in her favor." *Lavespere v. Niagara Mach. &
Tool Works, Inc.*, 910 F.2d 167, 178 (5th Cir. 1990) (citing
*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).  The
moving party bears the burden of establishing that there are no
genuine issues of material fact.

If the dispositive issue is one on which the nonmoving party
will bear the burden of proof at trial, the moving party may
satisfy its burden by merely pointing out that the evidence in

the record contains insufficient proof concerning an essential element of the nonmoving party's claim. *See Celotex*, 477 U.S. at 325; *see also Lavespere*, 910 F.2d at 178. The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists. *See Celotex*, 477 U.S. at 324. The nonmovant may not rest upon the pleadings, but must identify specific facts that establish a genuine issue exists for trial. *See id.* at 325; *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1996).

## III. Discussion

The Court has motions for summary judgment before it from four defendants.[2] The Court's reasoning will be applicable to plaintiffs' claims against all seven defendants.

### A. Louisiana antitrust laws

Defendants move for summary judgment on plaintiffs' claims under Louisiana antitrust laws codified in Louisiana Revised Statutes §§ 51:122 and 51:123.[3] These statutes are virtually identical to Sections 1 and 2 of the Sherman Antitrust Act, 15

---

[2] The other defendants, George Carmouche, James Huey, and the Levee District, have also filed motions for summary judgment. Because plaintiffs have yet to oppose those motions, the Court will consider them in a separate motion.

[3] Plaintiffs' memoranda suggest that they made claims under the Sherman Act as well as state antitrust statutes. Plaintiffs did not make these claims in any of their complaints, and thus the Court will not consider them.

U.S.C. § 1, *et seq.*, and federal analysis of the Sherman
Antitrust Act is persuasive, though not controlling. *Louisiana
Power & Light Co. v. United Gas Pipe Line Co.*, 493 So.2d 1149,
1154, 1158 (La. 1986).

Defendants assert that the record reflects that they did not
attempt to restrain trade in violation of section 51:122 since
(1) other salvage companies were authorized to operate in the
marinas when plaintiffs' vessels were salvaged, and (2) there is
no evidence to support the allegations that Marine Recovery
prohibited certain salvage companies to enter the marinas and
perform salvage operations.  They also aver that plaintiffs have
not provided sufficient proof of a conspiracy to monopolize in
violation of section 51:123 since plaintiffs have not provided
proof that the agreement between the Levee District and Marine
Recovery was an attempt to create a monopoly of the salvage
industry within the marinas.

The Court finds that not all of the plaintiffs have alleged
an injury in fact sufficient to establish an antitrust claim.
Louisiana antitrust law permits any person: "who is injured in
his business or property by any person by reason of any act or
thing forbidden by this Part, [to] sue . . . and . . . recover
threefold the damages sustained by him, the cost of suit, and a
reasonable attorney's fee." La. Rev. Stat. Ann. § 51:137; *see
also Free v. Abbott Laboratories, Inc.*, 176 F.3d 298, 299 (5th

Cir. 1999). This provision is also nearly identical to the federal antitrust enforcement provision, § 4 of the Clayton Act.[4]

Antitrust standing involves more than the "case or controversy" requirements of constitutional standing. *Todorov v. DCH Healthcare Auth.*, 921 F.2d 1438, 1448 (11th Cir. 1991) (citing *Flast v. Cohen*, 392 U.S. 93, 94-101) (1968)). Plaintiffs must show "antitrust injury, which is . . . injury of the type the antitrust laws were intended to prevent." *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 109 (1986) (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)); *see also Norris v. Hearst Trust*, 500 F.3d 454, 465 (5th Cir. 2007) ("plaintiff must prove more than injury causally linked to an antitrust violation"); *Doctor's Hosp. of Jefferson, Inc. v. Southeast Med. Alliance, Inc.*, 123 F.3d 301, 306 (5th Cir. 1997) (the standing inquiry "ensures that the plaintiff's demand for relief ultimately serves the purposes of antitrust law to increase consumer choice, lower prices and assist competition, not competitors"). The Fifth Circuit narrowly construes the meaning of antitrust injury. *See Anago, Inc. v. Tecnol Medical*

_____

[4]Section 4 of the Clayton Act, 15 U.S.C. § 15 (1997) states in part:

> [A]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States . . . and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.

*Products, Inc.*, 976 F.2d 248, 251 (5th Cir. 1992) (citing *Phototron Corp. v. Eastman Kodak Co.*, 842 F.2d 95, 100 (5th Cir. 1988)).

Plaintiffs have brought antitrust claims for price fixing under section 51:122 and attempt to monopolize or conspiracy to monopolize under section 51:123. To establish injury in a price fixing case, plaintiffs may simply show proof of purchase at a price higher than the competitive rate. *Robinson v. Texas Auto. Dealers Ass'n*, 387 F.3d 416, 422 (5th Cir. 2004) (citing *Nichols v. Mobile Bd. of Realtors, Inc.*, 675 F.2d 671, 676 (5th Cir. 1982)). An illegal price-fixing scheme is presumed to damage all purchasers of a price-fixed product. *In re NASDAQ Market-Makers Antitrust Litigation*, 169 F.R.D. 493, 526 (S.D.N.Y. 1996). Similarly, for monopoly claims, a consumer can obtain damages only if he shows that he actually paid more than the competitive level. *See In re Air Passenger Computer Reservation Systs.*, 727 F. Supp. 564, 569 (C.D. Cal. 1989) (citing P. Areeda & H. Hovenkamp, Antitrust Law ¶ 340.2b (1988 Supplement); *Wojcieszek v. New England Tel. and Tel. Co.*, 977 F. Supp. 527, 535 (D. Mass. 1997); *Simpson v. US West Comm., Inc.* 957 F. Supp. 201, 206 (D. Or. 1997). Here, however, only Lambert paid the allegedly higher prices charged by Resolve. The Court will now consider whether Lovelock and Scott have sustained antitrust injury sufficient to establish standing.

Lovelock was not seeking salvage services when his boat was salvaged by Resolve without his consent. Neither party disputes that Lovelock never negotiated with Resolve for salvage work and was never charged for the salvage. Lovelock was simply not injured by any violation of the antitrust laws; the only damage he claims he sustained resulted from Resolve's allegedly negligent salvage job. This is not the type of injury the antitrust laws were intended to protect. Because Lovelock has not sustained a cognizable antitrust injury, he does not have standing to bring an antitrust claim.

Scott, however, was in the market for salvage services. Scott negotiated with Resolve, but opted not to have his boat salvaged after Resolve quoted him its prices. Although Scott never paid the higher prices, Scott contends that he was damaged because as a result of the inflated prices, he could not afford to salvage his boat and was forced to sell it for $1. The Court must consider whether a nonpurchaser who would have purchased goods or services but for the allegedly inflated prices has standing to bring an antitrust claim.

The Court concludes that Scott lacks standing to bring such a claim. Although the Court has found no Fifth Circuit or Louisiana cases involving the standing of nonpurchasers, the Tenth Circuit considered the issue in *Montreal Trading Ltd. v. Amax Inc.*, 661 F.2d 864 (10th Cir. 1981). There, a Canadian

corporation sued several United States potash producers because of its inability to purchase potash. *Id.* at 865. The court held that the corporation had no standing to bring a price fixing claim. The court explained that "[a] price fixing conspiracy is certainly 'aimed' at those who purchase the product at the inflated price; their injury is more direct and more proximately caused than those who are unable to purchase due to product scarcity." *Id.* at 867. The court further noted that granting standing to nonpurchasers could result in large recoveries for those only minimally hurt by antitrust violations. *Id.* The court reasoned:

> If nonpurchasers who have never dealt with a defendant could recover, a seemingly unlimited number of plaintiffs could assert a virtually unlimited quantity of lost purchases, perhaps exceeding the potential output of the entire industry. With a treble damages entitlement, the result could be multiple recoveries and total damage awards wholly out of proportion with the 'fruits of the illegality,' easily bankrupting the named defendants.

*Id.* at 868. This Court finds this reasoning persuasive and consistent with the views of the Fifth Circuit in a related context, as discussed, *infra*. Allowing nonpurchasers to recover would unduly broaden the spectrum of potential plaintiffs with price fixing and monopolization claims. Anyone who considered, or claimed to consider, purchasing a product or service would have standing to bring such claims. Damages would vary widely depending on the consequences of a potential consumer's inability

to purchase. Courts would also be faced with complex causation issues. For instance, here the Court would have to determine whether Scott's inability to purchase salvage services for a period of less than two months caused damage to his boat above and beyond the damage it sustained from Hurricane Katrina and Rita.

The Fifth Circuit discussed similar prudential considerations in its determination that indirect purchasers did not have standing to bring price fixing claims under Louisiana antitrust law. *See Free v. Abbott Laboratories, Inc.*, 176 f.3d 298, 300-01 (5th Cir. 1999). The Court explained that allowing only direct purchasers to sue would "reduce the dimensions of complexity" of the litigation. *Id.* at 300. The Court expressed concern that if indirect purchasers were allowed to sue:

> The focus of suits would shift from the amount of increased prices caused by defendants' anticompetitive conduct (a relatively straightforward inquiry) to the allocation of damages among parties in the line of distribution to ultimate consumers. Litigation would be prolonged, would become far more complex factually and strategically, and would benefit lawyers and determined defendants while reducing recoveries for plaintiffs.

*Id.* at 301. Here, the Court finds that similar concerns weigh against granting nonpurchasers standing in price fixing and monopolization suits. While Scott's injury may be related to an antitrust violation, it is not the type of injury the antitrust laws were intended to protect. Thus Scott does not have standing

18

to bring an antitrust claim.  Because neither Scott nor Lovelock
have standing to bring a claim under the antitrust laws, the
Court GRANTS defendants' motions with regard to these two
plaintiffs.

As for the merits of Lambert's antitrust claims, the Court
is unable to determine if summary judgment is appropriate because
the parties have failed to brief certain issues pertinent to the
claims.  The Court will issue an order outlining the supplemental
briefing it will require of the parties and defer its ruling on
these claims until trial.

**B.    LUTPA**

Defendants contend that plaintiffs have failed to show that
defendants engaged in fraudulent and deceptive acts in violation
of LUTPA.  They further contend that plaintiff Lovelock cannot
recover since he was not a consumer or business competitor of
Marine Recovery or Resolve.

Under LUTPA, private parties who suffer an "ascertainable
loss" because of another party's unfair or deceptive trade
practices may bring suit to recover actual damages. La. Rev.
Stat. § 51:1409.  Although the text of section 1409 states that
"*any person* who suffers any ascertainable loss may bring suit,
the Fifth Circuit has given this statute a narrower reading,
limiting relief to individual consumers or business competitors.
*See Orthopedic & Sports Injury Clinic v. Wang Labs, Inc.*, 922

F.2d 220, 226 (5th Cir. 1991); *Delta Truck & Tractor v. J.I. Case Co.*, 975 F.2d 1192 (5th Cir. 1992); *cf. Indest-Guidry, Ltd. V. Key Office Equipment, Inc.*, --- So.2d ---, 2008 WL 4792422 at *12-*13 (La. Ct. App. 2008) (finding that business entities as well as individual consumers can recover as "consumers" under the statute). The statute defines "consumer" as "any person who uses, purchases, or leases goods or services." La. Rev. Stat. § 51:1402(1). But the Fifth Circuit has restricted the definition of "consumer" under LUTPA to individuals who are participants in a "consumer transaction." *Wang Labs*, 922 F. 2d at 226. A "consumer transaction" requires trade or commerce with a natural person and the subject of the transaction must be intended for personal, family, or household use. *Id.* (quoting La. Rev. Stat. § 51:1402(3)). "Trade" or "commerce" means "the advertising, offering for sale, sale, or distribution of any services and any property." La. Rev. Stat. § 51:1402(9).

The Court finds that only Lambert qualifies as a consumer under the statute. Lambert indisputably purchased salvaging services from Resolve, and since he uses his boat for personal, rather than business purposes, he fits the definition of consumer under the statute. But Scott and Lovelock do not qualify as consumers. Neither Scott nor Lovelock "used," "purchased," or "leased" goods or services. Neither contracted with Resolve for salvaging services. Scott, in fact, did not contract with anyone

20

for salvaging services and never received such services.
Lovelock also did not contract with anyone — his boat was
mistakenly salvaged by Resolve, and he was never charged for the
service.  Lovelock did not "use," "purchase," or "lease"
salvaging services; he received the services without his consent.
*See Montegut v. Williams Comm., Inc.*, 109 F. Supp. 2d 496, 499
(E.D. La. 2000) (finding that plaintiffs did not have a LUTPA
claim when defendants installed fiber optic cables on their land
without their consent).  Because Lovelock and Scott are not
consumers under the statute, the Court finds that Lambert alone
has standing to bring a LUTPA claim and GRANTS summary judgment
with regard to Scott and Lovelock's LUTPA claims against
defendants.  The Court will defer ruling on the merits of
Lambert's LUTPA claims until trial.

> C.    **Section 1983**

Defendants move for summary judgment on plaintiffs' claim
under 42 U.S.C. § 1983 that defendants violated plaintiffs' civil
rights by engaging in price fixing in violation of 15 § U.S.C. 2.
Defendants first assert that plaintiffs do not have an action
under section 1983 since they did not act under color of state
law.  They also contend that plaintiffs have not presented any
evidence that defendants engaged in price fixing.

Section 1983 provides a private right of action to any
person who is deprived of a federal constitutional or statutory

right by a person acting under color of state law. *See* 42 U.S.C. § 1983. To state a claim under section 1983, a plaintiff must allege: (1) that the defendant deprived him of a right secured by the Constitution or federal law; and (2) that the deprivation occurred under color of state law. *See Cornish v. Corr. Serv. Corp.*, 402 F.2d 545, 549 (5th Cir. 2005); *Brown v. Miller*, 631 F.2d 408, 410 (5th Cir. 1980).

Plaintiffs' claims under section 1983 are not easily ascertainable. Plaintiffs' complaint, under the heading "Intentional delicts, denial of civil rights, and criminal acts," alleges:

> The actions set forth hereinabove were done intentionally and without privilege under color of law, and were done in order to keep petitioner and other persons similarly situated from salvaging, lifting, moving, or even accessing their personal property and were done with an intention to defraud the plaintiff and other persons similarly situated and to illegally profit the defendants and their political cronies.

(R. Doc. 1-1 at ¶42). Under that heading, the complaint further states:

> The plaintiff is further informed and alleges that the defendants conspired to charge the plaintiff and other vessel owners in the Orleans Marina and South Shore Harbor Marina exorbitant prices to move their vessels and further conspired to charge exorbitant prices for the services of MRS . . . . The plaintiff alleges that these actions of the defendants also amount to illegal Price Fixing and illegal Price Gouging, as defined by law and that said acts and conspiracies were done intentionally by the defendants under color of law and that they also amount to a denial of civil rights under color of law.

(R. Doc. 1-1 at ¶43).  Plaintiffs' motions for partial summary judgment are also far from helpful.  In the motions, plaintiffs repeatedly refer to plaintiffs' right to acquire, use and dispose of private property under the Louisiana Constitution. *See* La. Const. art. I, § 4(1).  Violations of state law, however, whether constitutional or statutory, do not give rise to a § 1983 action. The Court surmises that plaintiffs have alleged a procedural due process claim for denial of their property rights.

The Due Process Clause prevents the state from depriving a person of life, liberty, or property without due process of law. U.S. CONST. amend. XIV.  In deciding whether state action has violated an individual's right to due process, the court must address two questions: "whether the state action has deprived the individual of a protected interest – life, liberty or property," and if so, "whether the state procedures available for challenging the deprivation satisfy the requirements of due process." *Augustine v. Doe*, 740 F.2d 322, 327 (5th Cir. 1984); *accord Neuwirth v. Louisiana State Bd. of Dentistry*, 845 F.2d 553, 556 (5th Cir. 1988); *Cuellar v. Texas Employment Comm'n,* 825 F.2d 930, 934 (5th Cir. 1987).

Even assuming, *arguendo*, that plaintiffs' right to access their property is a protected property interest and that defendants acted under color of state law, the record reflects that plaintiffs were never denied access to their property.

23

Lambert testified that when he first visited the marina after the

hurricane, "the gate was open, I went in." (Lambert Depo., p. 51,

13:21-15:18).  Lambert said that he went to the marina "quite

often."  He further testified:

> I can't say for sure that I went there every day, but I
> went there pretty often.  It was still kind of a hassle
> to get in.  I had to climb over the walk-through gate
> down at the end of the wall.  they have the main gates
> closed.  but I went over there pretty often.  I had to
> over there and retrieve some personal things off my
> boat.  And I went over there to do what I could to
> stabilize my boat.

(Lambert Depo., p. 53, 27:14-28:1).  Thus Lambert's main

complaint was that he was unable to access the marina through the

main gates, which, while inconvenient, does not qualify as a

deprivation of property that merits constitutional protection.

Scott testified that he was able to access his vessel as soon as

he returned to town on September 4, 2005. (Scott Depo., p. 31,

23:25-24:15).  He explained that he entered by climbing over the

wall with a ladder. (Scott Depo., p. 31, 25:5-7).  Scott

testified that he was subsequently unable to access the marina

until November 16, 2005, but he said that the National Guard —

not the Levee Board police or any other defendant — denied him

access.  Thus he also did not suffer a deprivation of property at

the hands of the defendants.  As for Lovelock, he never alleged

that he was denied access to his vessel and testified that he was

able to walk right up to his vessel in South Shore Marina when he

returned to town. (Lovelock Depo., p. 5, 25:25-26:9). Because none of the plaintiffs were ever denied access to their vessels, but merely inconvenienced in their ability to access them, the Court finds that plaintiffs have not suffered the requisite deprivation of property to establish a due process claim.

**D.   Breach of a depository contract and negligence**

Defendants move for partial summary judgment on plaintiffs' claims for breach of a compensated depository contract and negligence on the part of a negotiorum gestor.  The defendants aver that no compensated depository contract existed between plaintiffs and them and that they were never negotiorum gestors for the plaintiffs.  Plaintiffs have not opposed this motion.

**1.   Compensated depository contract**

The Louisiana Civil Code provides: "[a] deposit is a contract by which a person, the depositor, delivers a movable things to another person, the depository, for safekeeping under the obligation of returning it to the depositor upon demand." La. Civ. Code. art. 2926.  A contract of deposit is essentially a bailment, and takes place by the mutual consent of the person making the deposit and the person receiving it. La. Civ. code. art. 2932.  The principal requirements of such a contract are delivery of the property and mutual consent. *Northern Assurance Co. of America v. Cotton*, 658 So.2d 246, 248 (La. Ct. App. 1995). A depository contractual relationship is different in nature from

a lessor/lessee relationship. *See Guillot v. Kaplan Farmers Co-op, Inc.*, 352 So.2d 402, 404 (La. Ct. App. 1977) (finding that the nature of the contractual relationship in the case was that of a contractual deposit, not a lease).

The Court finds that no compensated depository contract existed between plaintiffs and any defendants.  Plaintiffs' leases with the Levee District do not qualify as depository contracts, as the lessees expressly agreed to indemnify the Levee District for any damage to the vessels. (R. Doc. 254-8 at ¶4). Thus the Levee District was not obligated to keep plaintiffs' vessels safe.  Other than the leases, neither Lovelock nor Scott contracted with any defendant and thus have no claim in this regard.  Lambert's contract with Resolve does not qualify as a compensated depository contract, since Lambert never delivered his vessel to Resolve, a necessary requirement for a depository contract.  Accordingly, the Court finds that the defendants are entitled to summary judgment on this claim.

### 2.   Negligence on the part of the negotiurum gestors

Under Louisiana law, a quasi-contract is created when a person, the gestor, voluntarily undertakes to manage another's affairs, whether the person is aware of the benefit or not. *Coastal Envtl. Specialists, Inc. v. Chem-Lig Intern., Inc.*, 818 So.2d 12, 20 (La. Ct. App. 2001).  Such a "management of affairs" (negotiorum gestio) exists when "a person, the manager, acts

26

without authority to protect the interests of another, the owner, in the reasonable belief that the owner would approve of the action if made aware of the circumstances." La. Civ. Code art. 2292.  The manager is obligated to "exercise the care of a prudent administrator and is answerable for any loss that results from his failure to do so." La. Civ. Code art. 2295.  A negotiorum gestio exists only when a manager is doing another's business, not his own business. *Coastal Envtl. Specialists,* 818 So.2d at 21. (citing *Burns v. Sabine River Auth.,* 614 So.2d 1337, 1340 (La. Ct. App. 1993)).

Here, plaintiff Lovelock alleges that defendants acted as negotiorum gestors when they moved his boat without his permission.  Lovelock, however, has offered no evidence that defendants undertook to manage his affairs in the reasonable belief that he would approve of the actions.  Only Resolve was involved in the salvage of Lovelock's boat, but in salvaging the boat, Resolve was not acting as a manager on behalf of Lovelock. Resolve was "doing its own business," salvaging boats, and merely salvaged Lovelock's boat in error. (*See* Lovelock Depo., p. 9, 47:4-9).  Defendants are thus entitled to summary judgment on this claim.


**IV.  Conclusion**

For the foregoing reasons, the Court GRANTS defendants'
motions for summary judgment on plaintiffs' claims under section
1983 and for breach of a compensated depository contract and
negligence on the part of a negotiorum gestor.  The Court also
GRANTS defendants' motions for summary judgment on Scott and
Lovelock's antitrust and LUTPA claims.



New Orleans, Louisiana, this 22nd day of January, 2009.

_____
SARAH S. VANCE
UNITED STATES DISTRICT JUDGE